UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No: |
| | ) | |
| V. | ) | VIOLATIONS: |
| | ) | 18 U.S.C. § 1349 - |
| 1. JAMES E. LEVIN, and | ) | Conspiracy to Commit |
| 2. JACKLYN M. SUTCIVNI | ) | Wire Fraud |
| f/k/a JACQUELINE VACHON-JACKSON | ) | |
| | ) | 18 U.S.C. § 1343 - |
| | ) | Wire Fraud |
| | ) | |
| | ) | 18 U.S.C. § 286 - |
| | ) | Conspiracy to Defraud |
| | ) | the United States |
| | ) | |
| | ) | 18 U.S.C. § 287 - |
| | ) | False, Fictitious or Fraudulent |
| | ) | Claims |
| | ) | |
| | ) | 18 U.S.C. § 981(a)(1)(C) and |
| | ) | 28 U.S.C. § 2461(c) - |
| | ) | Criminal Forfeiture |

## INDICTMENT

The Grand Jury charges:

## Relevant Entities and Persons

At all times relevant to this Indictment:

1.      JAMES E. LEVIN ("LEVIN") was an individual living in Natick, Massachusetts,

and an attorney licensed in the Commonwealth of Massachusetts.

2.      JACKLYN SUTCIVNI, formerly known as JACQUELINE VACHON-

JACKSON ("SUTCIVNI"), was an individual living in Dracut, Massachusetts.  SUTCIVNI

worked for the City of Worcester ("COW") in the Housing Development Office of the Executive

Office of Economic Development.

3.     Levin Development, LLC ("Levin Development") was a Massachusetts limited liability company with its principal place of business at 10 Liberty Square in Boston, Massachusetts, and later at 23 Water Street, Holliston, Massachusetts and 21 Illinois Street, Unit 101, Worcester, Massachusetts.  At all relevant times, LEVIN was the sole manager of Levin Development.

4.     Five May Street Apartments, LLC ("Five May Street Apartments") was a Massachusetts limited liability company with its principal place of business at 23 Water Street, Holliston, Massachusetts, and later at 21 Illinois Street, Unit 101, Worcester, Massachusetts.  At all relevant times, LEVIN was the sole manager, or co-manager with one other individual, of Five May Street Apartments.

5.     Coat of Arms Construction, LLC ("Coat of Arms Construction") was a Massachusetts limited liability company with its principal place of business at 23 Water Street, Holliston, Massachusetts, and later at 21 Illinois Street, Unit 101, Worcester, Massachusetts and 21 Illinois Street, Unit 201, Worcester, Massachusetts.  At all relevant times, LEVIN was the sole manager of Coat of Arms Construction.

6.     Whiz Kids Development, LLC ("Whiz Kids") was a Massachusetts limited liability company with its principal place of business at 23 Water Street, Holliston, Massachusetts, and later at 21 Illinois Street, Unit 101, Worcester, Massachusetts.  At all relevant times, LEVIN was the sole manager of Whiz Kids Development.

7.     21 Illinois St, LLC ("21 Illinois St") was a Massachusetts limited liability company with its principal place of business at 10 Liberty Square, Boston, Massachusetts, and later at 23 Water Street, Holliston, Massachusetts, and 21 Illinois Street, Unit 101, Worcester, Massachusetts, 21 Illinois Street, Unit 201, Worcester, Massachusetts and 4 Hopewell Farm

2

Road, Natick, Massachusetts. At all relevant times, LEVIN was the sole manager of 21 Illinois St.

8.      Hard Shell Development, LLC ("Hard Shell") was a Massachusetts limited liability company with its principal place of business at 23 Water Street, Holliston, Massachusetts, and later at 21 Illinois Street, Unit 101, Worcester, Massachusetts. At all relevant times, LEVIN was the sole manager of Hard Shell.

9.      Bank of America is a financial institution where COW maintained a business checking account ending in -4682. At all relevant times, Bank of America maintained its servers outside of the Commonwealth of Massachusetts.

10.     The United States Department of Housing and Urban Development ("HUD") made federal funds available to develop viable communities through suitable housing and living environments, and opportunities for economic growth. These funds targeted low to moderate income neighborhoods, and were distributed by HUD in the form of Community Development Block Grants ("CDBG") to, among others, state and local governments.

11.     Under Title III of the Housing and Economic Recovery Act of 2008, Congress established the Neighborhood Stabilization Program ("NSP") for the purpose of stabilizing communities that had suffered from foreclosures and abandonment resulting from the 2007-2008 economic crisis. NSP provided grants to every state, as well as certain local communities and other organizations, to purchase and rehabilitate foreclosed or abandoned homes in order to stabilize neighborhoods and stem the decline of neighboring home values. NSP was a component of CDBG and was governed generally by CDBG regulations.

12.     The HUD Home Investment Partnerships Program ("HOME") provided formula grants to states and localities to fund a wide range of activities including building, buying, and/or

3

rehabilitating affordable housing for rent or homeownership, or providing direct rental assistance to low income people. HUD awarded HOME funds annually to participating jurisdictions, and established HOME Investment Trust Funds for each grantee, providing a line of credit that the jurisdiction could draw upon as needed. States and local governments were permitted to use HOME funds for grants, direct loans, loan guarantees or other forms of credit enhancement, or rental assistance or security deposits.

13.     The HUD Lead Based Paint Hazard Control ("LHC") and the Lead Hazard Reduction ("LHRD") programs (together, "Lead Abatement") provided grants to state and local governments to help alleviate the threat of lead poisoning in privately-owned and low-income housing.

14.     HUD made NSP and HOME funds available to COW and the Commonwealth of Massachusetts (through the Massachusetts Department of Housing and Community Development ("DHCD")). These federal funds targeted low to moderate income neighborhoods, and were distributed by HUD and the DHCD to COW. HUD and the DHCD authorized COW, through contracts and legislation, to administer and distribute NSP and HOME funds on behalf of HUD.

15.     HUD also made Lead Abatement funds available to COW.

16.     The Massachusetts Housing Investment Corporation ("MHIC") was a private, non-profit organization made up of a consortium of private banks to provide financing for affordable housing.

## General Allegations Regarding the Fraud Scheme

17.     Beginning in or about July 2010 and continuing until in or about September 2011, the defendants (1) devised, and intended to devise, a scheme and artifice to defraud and to obtain

4

money and property by means of materially false and fraudulent pretenses, representations and

promises, in violation of 18 U.S.C. § 1343, and (2) made and presented to a department and

agency of the United States, a claim, knowing such claim to be false, fictitious and fraudulent, in

violation of 18 U.S.C. § 286 by, among other things, submitting and approving materially false

and fraudulent payment requests to COW for HUD funding purportedly used to rehabilitate a

multi-unit apartment building at 5 May Street, Worcester, Massachusetts ("5 May Street") and

causing such monies to be paid.

## Manner and Means of the Fraud Scheme

18.    The manner and means by which the defendants accomplished the objectives of

the scheme, included, among others, the following:

> a.    LEVIN, on behalf of Five May Street Apartments, applied for and
> obtained federal funds from HUD's NSP, HOME and Lead Abatement programs,
> purportedly for the purpose of rehabilitating 5 May Street.
>
> b.    From on or about July 8, 2010 through on or about September 2, 2011,
> LEVIN, on behalf of Five May Street Apartments, submitted seven separate
> payment requests to COW in which LEVIN certified that certain work was
> performed and costs were incurred at 5 May Street.  However, LEVIN knew that
> these payment requests were false and fraudulent in that LEVIN had not incurred
> all of the costs he included in the payment requests, nor had all of the work he
> described been completed.
>
> c.    SUTCIVNI, in her job in COW's Housing Development Office, approved
> the payment requests submitted by LEVIN on behalf of Five May Street
> Apartments, and submitted corresponding Project Cash Request forms to COW
> for payment to Five May Street Apartments, even though SUTCIVNI knew that
> the payment requests submitted by LEVIN were false and fraudulent in that they
> did not accurately reflect work performed or costs incurred.
>
> d.    Between approximately July 30, 2010 and September 16, 2011, the
> defendants caused COW to pay approximately $2,365,050 to Five May Street
> Apartments, based upon the false and fraudulent payment requests LEVIN
> submitted and SUTCIVNI approved.  LEVIN negotiated or caused to be
> negotiated these checks, drawn on Bank of America accounts for COW, into his
> bank accounts at other financial institutions.

    e.      After COW issued payments to Five May Street Apartments, SUTCIVNI or other COW employees initiated electronic reimbursement requests from DHCD or HUD for the HUD NSP, HOME, and Lead Abatement funds.

    f.      Between approximately July 27, 2010 and September 12, 2011, DHCD or HUD electronically deposited $2,080,986.86 dollars into COW's Bank of America account ("the BOA Account"), representing the HUD NSP, HOME, and Lead Abatement funds for the 5 May Street rehabilitation project ("5 May Project").

### Specific Allegations Regarding the Fraud Scheme

### 5 May Street Property

19.    In or about the fall of 2009, LEVIN met with SUTCIVNI and others to discuss development projects in COW and federal monies available for such projects.

20.    In or about the fall of 2009, LEVIN began negotiating the purchase of 5 May Street by one of his companies, Water Street Mill Corporation ("Water Street").

21.    5 May Street was a multi-unit residential building in Worcester that qualified to receive HUD NSP, HOME, and Lead Abatement funds.

22.    On or about December 8, 2009, COW provided LEVIN a conditional commitment of $400,000 in NSP funding and $30,000 of COW HUD Lead Abatement funding for the rehabilitation of 5 May Street (the "5 May Project").

23.    On or about January 19, 2010, LEVIN, through a business partner, entered into a purchase and sale agreement for 5 May Street for $435,000.

24.    On or about January 20, 2010, COW, on behalf of LEVIN Development, requested funding from DHCD in the amount of $1,740,000, consisting of acquisition funding of $480,000 and construction funding of $1,260,000. SUTCIVNI signed the letter on behalf of COW.

25.     On or about January 22, 2010, COW, on behalf of LEVIN Development, again requested funding from DHCD, this time in the amount of $1,695,000, consisting of acquisition funding of $435,000 and construction funding of $1,260,000. SUTCIVNI's supervisor signed the letter on behalf of COW.

26.     On or about February 18, 2010, SUTCIVNI emailed an individual at DHCD, indicating that LEVIN may not consummate the purchase of 5 May Street without a commitment letter from DHCD for the funds sought, and requested a commitment letter by the following day.

27.     On or about February 19, 2010, COW notified LEVIN of its conditional commitment of COW-administered NSP funds totaling $400,000, to be augmented with an additional $1,300,000 in NSP funding from DHCD, for the 5 May Project. On or about March 5, 2010, DHCD awarded $1,310,000 in NSP grants to COW specifically "to assist with the 5 May Street redevelopment project."

28.     On or about February 19, 2010, LEVIN filed or caused to be filed a Certificate of Organization with the Commonwealth of Massachusetts Corporations Division for the formation of Five May Street Apartments, which identified LEVIN and another individual as Managers.

29.     On or about March 1, 2010, LEVIN and his business partner, through Five May Street Apartments, purchased 5 May Street for $435,000, using funds purportedly loaned by Levin Development.

30.     On or about April 8, 2010, LEVIN submitted a Neighborhood Stabilization Loan Fund ("NSLF") application to MHIC, on behalf of Levin Development, seeking a construction loan or revolving loan fund which, if approved, would require LEVIN to submit project-specific requests in order to draw down the money. In the NSLF application, LEVIN indicated that the total development cost for the 5 May Project was $1,700,000.

7

31.     On or about May 25, 2010, LEVIN submitted a OneStop Low Income Housing Tax Credit ("OneStop") application to MHIC wherein he estimated (1) his total construction budget to be $1,811,669 and (2) his general development costs (such as architect, engineering, legal, security, loan interest and fees and permits) to be $474,500.  The OneStop application sought a $975,000 subsidy from MHIC-controlled NSP funds, which was wholly independent from LEVIN's NSLF application.

32.     On or about June 2, 2010, SUTCIVNI emailed an MHIC employee to offer COW support for the 5 May Project and LEVIN's request for subsidy funding.

33.     Shortly thereafter, despite SUTCIVNI's attempt to persuade MHIC to provide subsidy funding, MHIC denied LEVIN's request.

34.     On or about June 11, 2010, a COW Rehabilitation Specialist performed a preliminary inspection of 5 May Street to estimate the rehabilitation cost of the property.  On or about July 6, 2010, the COW Rehabilitation Specialist submitted a detailed cost estimate to COW indicating that the hard construction costs, *i.e.* materials and labor, for 5 May Street would be approximately $1,200,000.

35.     On or about June 29, 2010, notwithstanding its denial of LEVIN's request for a subsidy, MHIC approved Levin Development for an interest-bearing, revolving NSLF Acquisition / Construction Loan not to exceed $1,500,000, which included a $350,000 line of credit.  LEVIN notified SUTCIVNI of this approval the same day.

36.     The following day, on or about June 30, 2010, SUTCIVNI sought additional funding from COW for the 5 May Project, recommending an increase in the amount of COW-administered NSP funds from $400,000 to $540,000.  SUTCIVNI sent a memorandum to her then-boss, in which she stated, "Recent issues with MHIC have prevented [LEVIN] from

8

accessing funds through MHIC and a significant deficit in the amount of $780,000 currently exists. DHCD is working with MHIC in an attempt to encourage MHIC to fill the funding gap. MHIC has indicated that they will entertain an amount not to exceed $350,000." SUTCIVNI further stated that the 5 May Project was "moving forward despite the deficit and construction will be completed on time."

37.     On or about July 26, 2010, LEVIN, via one of his companies, entered into the revolving loan agreement with MHIC in the amount of $1,500,000 including a $350,000 line of credit.

38.     On or about July 13, 2010, LEVIN's attorney submitted a construction budget to COW indicating that the total construction costs for the 5 May Project were $1,818,090.

39.     On or about July 14, 2010, LEVIN, as manager of Five May Street Apartments, executed a Loan Agreement (the "Agreement") with COW, by which COW agreed to contribute a total of $1,940,000 towards rehabilitation of 5 May Street, consisting of $1,840,000 in NSP funding and $100,000 in Lead Abatement funding. The Agreement stated that the funds could only be used for "Eligible Project Costs" which only included materials, hard construction and site-work costs ($1,611,900), the property acquisition cost ($435,000), and general conditions / builder's overhead and profit ($207,000). The Agreement estimated the total cost to be $129 per square foot, and the detailed estimated costs were set forth as "Exhibit C" to the Agreement. In the Agreement, LEVIN agreed, among other things, that he would comply with the provisions of the Massachusetts conflict-of-interest law (Mass. Gen. L. c. 268A).

40.     Pursuant to the Agreement, LEVIN initiated payment requests, described below, and COW issued checks to Five May Street Apartments.

9

41.     After COW issued payments relating to the 5 May Project, SUTCIVNI or other COW employees initiated an electronic drawdown request to obtain reimbursement from DHCD or HUD for the funds.  Thereafter, DHCD or HUD would electronically transfer the funds to the BOA Account.

42.     On or about August 3, 2010, LEVIN applied for a construction permit from COW for the 5 May Project.  LEVIN stated that the description of proposed work was to "renovate existing 13 unit apartments – windows thru-out" and estimated the construction costs to be $850,000.  LEVIN signed the application under the pains and penalties of perjury, declaring that "the statements and information on the foregoing application are true and accurate, to the best of my knowledge and belief."

43.     On or about September 29, 2010 – 20 days after LEVIN submitted a payment requisition form in which he represented that 22% of the project was complete – a COW employee emailed LEVIN and inquired whether demolition had begun.  LEVIN responded that same day, "Nope, just pre-development trash removal" and copied SUTCIVNI in his response.

44.     On or about October 12, 2010, the same COW employee emailed LEVIN and inquired when demolition and roofing work was scheduled to begin.  LEVIN responded, again copying SUTCIVNI on his email, "We are ONLY doing predevelopment environetal [sic] cleaning and some shoring for safety.  We will only commence new construction or demo work after November 5 after DHCD makes a site visit no roofs windows electrical until DHCD has approved our plans.  Please speak with [SUTCIVNI] about this."  Approximately one hour later, SUTCIVNI sent the following email to LEVIN and the COW employee: "Correction:  You are ONLY doing predevelopment environmental cleaning work now and will ONLY commence demo and new construction when you receive a Proceed Order from me."

10

## The False Certifications

45.     On or about July 8, 2010, LEVIN submitted the first payment request to COW relating to the 5 May Project.  LEVIN requested a payment of $724,115.86, certifying that $33,167.88 in direct construction costs (2.86% of the $1,159,410 budgeted for direct construction) was completed, and signed the form both as owner and, at SUTCIVNI's instruction, as the architect or the person certifying the specific costs were incurred.

46.     LEVIN knowingly requested reimbursement for costs that were not Eligible Project Costs under the July 14, 2010 Agreement with COW, including (1) $25,000 for architecture/engineering, (2) $34,000 in legal fees, (3) $32,500 in construction loan interest, (4) $31,000 for "financing fees," (5) $30,000 in development consultant fees, and (6) $54,500 in "Code Review Consultants."  Although over 30% of the expenses were for non-Project Eligible Costs, SUTCIVNI approved the request on or about July 16, 2010.  On or about July 30, 2010, COW issued a payment of $724,115.86 to Five May Street Apartments.  On or about August 2, 2010, LEVIN endorsed the COW check and deposited it into an account in the name of Five May Street Apartments at Southbridge Savings Bank.

47.     On or about July 27, 2010, SUTCIVNI created a claim to DHCD seeking payment to COW for $184,115.86 in NSP funds disbursed for the 5 May Project.

48.     On or about July 27, 2010, SUTCIVNI created a claim to HUD seeking payment to COW for $200,000 in NSP funds disbursed for the 5 May Project.

49.     On or about July 28, 2010, SUTCIVNI created a second claim to DHCD seeking payment to COW for $340,000 in NSP funds disbursed for the 5 May Project.

11

50.     LEVIN used his company, Coat of Arms Construction, as well as other individuals with whom LEVIN had previously worked, purportedly to perform the rehabilitation work at 5 May Street.

51.     On or about September 9, 2010, LEVIN submitted the second payment request relating to the 5 May Project.  LEVIN requested a payment of $431,163, certifying that the total work completed and materials stored to date for the 5 May Project was 22.22%, again signing the form both as owner and as the architect or the person certifying the specific costs were incurred. LEVIN did not submit any supporting invoices or receipts as required under the Agreement, and knew that the work and expenses claimed therein were false or fraudulent.  SUTCIVNI approved the request on or about September 15, 2010.  On or about September 24, 2010, COW issued a payment of $431,163, which was deposited into an account in the name of Five May Street Apartments at Middlesex Savings Bank approximately three days later.

52.     On or about September 24, 2010, a COW employee created a claim to HUD seeking payment to COW for $65,000 in Lead Abatement funds disbursed for the 5 May Project.

53.     On or about January 12, 2011, SUTCIVNI created a claim to DHCD seeking payment to COW for $937,583, of which $366,163 in NSP funds had been disbursed for the 5 May Project.

54.     On or about November 18, 2010, LEVIN submitted the third payment request relating to the 5 May Project.  LEVIN requested a payment of $250,000, certifying that the total work completed and materials stored to date for the 5 May Project was 72.44%, again signing the form both as owner and as the architect or the person certifying the specific costs were incurred. LEVIN did not submit any supporting invoices or receipts as required under the Agreement, and knew that the work and expenses claimed therein were false or fraudulent.  Although the

12

payment request appears to be dated November 18, 2010, SUTCIVNI appears to have approved

the request on or about November 9, 2010.  On or about November 23, 2010, COW issued a

payment of $250,000, which was deposited into the Five May Street Apartments account at

Middlesex Savings Bank on or about November 24, 2010.

55.     On or about January 12, 2011, SUTCIVNI created a claim to DHCD seeking

payment to COW for $937,583, of which $250,000 in NSP funds had been disbursed for the 5

May Project.

56.     On or about December 2, 2010, LEVIN submitted the fourth payment request

relating to the 5 May Project.  LEVIN requested a payment of $250,000, certifying that the total

work completed and materials stored to date for the 5 May Project was 85.32%, again signing the

form both as owner and as the architect or the person certifying the specific costs were incurred.

LEVIN did not submit any supporting invoices or receipts as required under the Agreement, and

knew that the work and expenses claimed therein were false or fraudulent.  SUTCIVNI approved

the request on or about December 6, 2010.  On or about December 17, 2010, COW issued a

payment of $250,000, which was deposited into the Five May Street Apartments account at

Middlesex Savings Bank on or about December 20, 2010.

57.     On or about December 21, 2010, a COW employee created a claim to HUD

seeking payment to COW for $35,000 in Lead Abatement funds disbursed for the 5 May Project.

58.     On or about January 12, 2011, SUTCIVNI created a claim to DHCD seeking

payment to COW for $937,583, of which $215,000 in NSP funds had been disbursed for the 5

May Project.

59.     On or about March 15, 2011, LEVIN submitted the fifth payment request relating

to the 5 May Project.  LEVIN requested a payment of $200,658, certifying that the total work

completed and materials stored to date for the 5 May Project was 95.67%, again signing the form both as owner and as the architect or the person certifying the specific costs were incurred. LEVIN did not submit any supporting invoices or receipts as required under the Agreement, and knew that the work and expenses claimed therein were false or fraudulent. SUTCIVNI approved the request on or about March 15, 2011. On or about April 1, 2011, COW issued a payment of $200,658, which was deposited into the Five May Street Apartments account at Middlesex Savings Bank on or about April 6, 2011.

60.     On or about June 1, 2011, SUTCIVNI created a claim to DHCD seeking payment to COW for $200,658 in NSP funds disbursed for the 5 May Project.

61.     At some point between March 15, 2011 and July 26, 2011, SUTCIVNI sought additional funding from COW for the 5 May Project in the amount of $450,000, consisting of $250,000 in HOME funds and an additional $200,000 in NSP funds.

62.     On or about July 22, 2011, LEVIN, on behalf of Five May Street Apartments, executed the First Amendment to Loan Agreement with COW, among other documents, which increased the total loan from COW from $1,940,000 to $2,390,000. In the First Amendment to Loan Agreement, LEVIN indicated that "Borrower's [sic] encountered an unexpected reduction in funding that necessitated borrowing additional funds to complete the Project."

63.     On or about July 26, 2011, LEVIN submitted the sixth payment request relating to the 5 May Project. LEVIN requested a payment of $284,063, certifying that the total work completed and materials stored to date for the 5 May Project was 89.54%, lower than the previous submission because of the additional $450,000 that had since been allocated to the 5 May Project. LEVIN signed the form as the owner. LEVIN did not submit any supporting invoices or receipts as required under the Agreement, and knew that the work and expenses

14

claimed therein were false or fraudulent. On or about August 2, 2011, COW issued a payment of $284,063, which was deposited into the Five May Street Apartments account at Middlesex Savings Bank on or about August 3, 2011.

64.     COW did not initiate a drawdown request from HUD or DHCD for these funds.

65.     On or about September 2, 2011, LEVIN submitted the seventh payment request relating to the 5 May Project. LEVIN requested a payment of $225,050, certifying that the total work completed and materials stored to date for the 5 May Project was 98.96%, again signing the form both as owner and as the architect or the person certifying the specific costs were incurred. LEVIN did not submit any supporting invoices or receipts as required under the Agreement, and knew that the work and expenses claimed therein were false or fraudulent. SUTCIVNI approved the request on or about September 2, 2011. On or about September 16, 2011, COW issued a payment of $225,050, which was deposited into the Five May Street Apartments account at Middlesex Savings Bank on or about September 21, 2011.

66.     On or about September 12, 2011, a COW employee created a claim to HUD seeking payment to COW for $225,050 in HOME funds disbursed for the 5 May Project.

67.     On or about May 14, 2012, LEVIN submitted a letter to COW responding to a COW letter dated April 19, 2012 in which COW requested that LEVIN provide appropriate supporting documentation respecting the prior payment requests submitted to COW for the 5 May Project. In his response, LEVIN acknowledged that COW requisitions were "not consistent with the construction budget" for the 5 May Project. LEVIN provided a revised form known as an "AIA Continuation Sheet G703," which detailed what LEVIN stated was "the latest cost estimate and budget for your files for the May Street Project." In the revised AIA Continuation Sheet G703, LEVIN purported to account for the $2,365,050 he received from COW. The

15

revised AIA Continuation Sheet G703 differed in material ways from the prior AIA Continuation Sheets that had been submitted.

68.     Beginning on or about July 30, 2010 and ending on or about September 16, 2011, pursuant to the Agreement, COW paid to LEVIN, on behalf of Five May Street Apartments, a total of $2,365,050 in HUD NSP, HOME, and Lead Abatement funds for the 5 May Project.

69.     From on or about July 27, 2010 through on or about September 14, 2011, COW received wire transfers to the BOA Account from DHCD and HUD, which represented drawdowns on the HUD funds for the 5 May Project, totaling  $2,080,986.86.

70.     SUTCIVNI was the COW employee responsible for oversight of the 5 May Project, and was the COW official responsible for review and approval of all payment requests submitted by LEVIN for the 5 May Project.  SUTCIVNI knew that the payment requests were false and fraudulent because the work had not been completed and the costs had not been incurred as represented on the payment requests.

71.     In or about February 2012, the COW Housing Director inspected the 5 May Project after oversight for the project was transferred from SUTCIVNI to him.  During the visit, the Housing Director discovered that the project was not 98.86% complete, as LEVIN had represented it to be in his last payment request submitted on or about September 2, 2011, which SUTCIVNI had approved.  Despite LEVIN's representations in the September 2, 2011 payment request that, for example, 95.89% of the finish carpentry, 100% of the insulation, 98.35% of the drywall, 94.35% of the tile work, 99% of the resilient flooring, 94.33% of the paint and decorating, 100% of the cabinets and appliances, had been completed, the Housing Director observed that there were no finished interior walls or floors, no cabinetry, no new insulation, no

16

new drywall, no tile work, no painting or decorating, and no appliances other than some new bathtubs at 5 May Street.

## Interstate Wire Transmissions

72.    Each time LEVIN submitted a payment request, COW issued a check from the BOA Account payable to Five May Street Apartments. LEVIN deposited or caused to be deposited each of those checks into the Five May Street Apartments account either at Southbridge Savings Bank (for the first check) or Middlesex Savings Bank (for the remaining checks).

73.    When a COW Bank of America check is deposited at a different financial institution, the funds being withdrawn from the BOA Account are stored for some period of time in one of Bank of America's out of state servers before being electronically transferred to the recipient bank account which, in this case, was either the Southbridge Savings Bank or Middlesex Savings Bank in Massachusetts.

74.    In addition, when an electronic drawdown request was made to obtain reimbursement from HUD, HUD would initiate an ACH payment to COW's BOA Account. At all relevant times, HUD funds originated outside of the Commonwealth of Massachusetts, so the ACH payment traveled in interstate commerce.

### 21 Illinois Street, Unit 504, 2 Ionic Avenue, and 661 Main Street

75.    As part of her job with COW, SUTCIVNI was required to establish residency within COW limits.

76.    On or about October 21, 2010, LEVIN provided SUTCIVNI an Offer to Purchase a condominium located at 21 Illinois Street, unit 206, Worcester, Massachusetts for $110,000 including a parking easement. SUTCIVNI reportedly told LEVIN she could not purchase a

17

condominium owned by him because she was overseeing the 5 May Project and it would be a conflict of interest.

77.     On or about October 22, 2010, LEVIN's business partner, the same business partner who had purchased 5 May Street with LEVIN, purportedly provided SUTCIVNI an Offer to Purchase a condominium located at 21 Illinois Street, Unit 504, Worcester, Massachusetts ("Unit 504") for $120,000.

78.     LEVIN and his business partner had a discussion that involved the terms of the sale of Unit 504 to SUTCIVNI, including that SUTCIVNI was purchasing the condominium, the purchase price, and the business partner would provide a private-mortgage to SUTCIVNI.

79.     On or about December 29, 2010, SUTCIVNI purportedly purchased Unit 504 from LEVIN's business partner.

80.     SUTCIVNI never moved to Unit 504 but falsely represented to COW that she lived there.

81.     After SUTCIVNI's purported purchase of Unit 504, she continued to oversee the 5 May Project, including approving payment request forms submitted by LEVIN and requesting an additional $450,000 in HUD funding for the 5 May Project.  In addition, after SUTCIVNI's purported purchase of Unit 504, she oversaw the redevelopment of another property involving LEVIN located at 2 Ionic Avenue, Worcester, Massachusetts ("2 Ionic") and assisted LEVIN in obtaining a $350,000 acquisition-only HOME grant for the purchase of 2 Ionic.

82.     In or around June 2010, SUTCIVNI informed LEVIN about various parcels of land located in Worcester, including the Boys Club at 2 Ionic and the Caravan site at 661 Main Street ("661 Main"), that were "teetering on foreclosure."  Thereafter, on or about September 28, 2010, SUTCIVNI informed LEVIN about upcoming auctions for 2 Ionic and 661 Main, and

informed LEVIN that SUTCIVNI had spoken with United Bank, the holder of mortgages on the properties.

83.     On or about November 1, 2010, LEVIN emailed SUTCIVNI an offer for the purchase of 2 Ionic and 661 Main, seeking SUTCIVNI's review and comment on the offer. Thereafter, LEVIN engaged in negotiations with United Bank, the holder of Mortgage and Security Agreements encumbering 2 Ionic and 661 Main, for the purchase of those mortgages and security agreements.

84.     On or about December 20, 2010, United Bank assigned a Mortgage and Security Agreement dated February 28, 2007 which encumbered 2 Ionic to Whiz Kids.

85.     On or about December 20, 2010, United Bank assigned a Mortgage and Security Agreement dated May 25, 2007 which encumbered 661 Main to Hard Shell.

86.     On or about December 28, 2010, Whiz Kids acquired title to 2 Ionic through foreclosure deed.

87.     On or about December 28, 2010, Hard Shell acquired title to 661 Main through foreclosure deed.

88.     On or about January 30 or 31, 2011, an oil spill occurred at 2 Ionic that required cleanup involving the Massachusetts Department of Environmental Protection ("DEP"), among other entities.

89.     On or about February 9, 2011, DEP notified LEVIN, on behalf of Whiz Kids, that there was one or more releases or threats of release of oil or hazardous material at 2 Ionic, and that pursuant to state law, LEVIN was jointly and severally liable to the Commonwealth of Massachusetts for an amount up to three (3) times all present and future costs of assessment, containment and removal incurred plus all damages to natural resources.

90.     On or about February 15, 2011, LEVIN, on behalf of Whiz Kids, entered into a Loan Agreement (the "2 Ionic Agreement") with COW, by which COW agreed to contribute a total of up to $350,000 in HOME funds towards the acquisition and pre-development costs of 2 Ionic.

91.     On or about February 22, 2011, SUTCIVNI completed and submitted a Project Cash Request to COW, requesting $350,000 in HOME funds for the 2 Ionic Avenue project.

92.     On or about March 1, 2011, COW issued a check to Whiz Kids for $350,000, which was deposited into the Whiz Kids bank account at Middlesex Savings Bank on or about March 1, 2011.

93.     After the oil spill at 2 Ionic, LEVIN received invoices totaling at least $230,873.17 in clean-up costs. SUTCIVNI assisted LEVIN in attempting to obtain Brownfield Cleanup Revolving Loan Fund ("BCRLF") funds for the costs incurred for the clean-up of the oil spill, including assisting LEVIN with finding a non-profit entity to acquire 2 Ionic to attempt to receive BCRLF funds for clean-up costs.

94.     On or about June 23, 2011, Hard Shell provided a quitclaim deed to Hadley Apartments, LLC for 661 Main, in exchange for $550,000. The following day, Hadley Apartments, LLC provided a quitclaim deed to Hard Shell for 661 Main, in exchange for $1.00.

95.     On or about June 28, 2011, Hard Shell entered into a Parking Lease Agreement with Hadley Apartments, LLC, for a 20 year parking lease at 661 Main in the amount of $550,000.

96.     On or about March 29, 2012, Coat of Arms Construction filed a Statement of Account pursuant to Massachusetts General Laws chapter 254, section 8 purportedly reflecting an amount of $255,272.37 owed to it relating to work performed at 2 Ionic.

97.     On or about March 29, 2012, Coat of Arms Construction filed a Statement of

Account pursuant to Massachusetts General Laws chapter 254, section 8 purportedly reflecting

an amount of $131,045.98 owed to it relating to work performed at 2 Ionic.

98.     On or about April 30, 2013, Hard Shell sold 661 Main for $165,000.

## Conduct in Furtherance of the Wire Fraud Conspiracy and
## the Conspiracy to Defraud HUD

99.     In furtherance of the conspiracy and to accomplish the objects of the conspiracy,

the defendants committed and caused to be committed the following acts, among others, in the

District of Massachusetts and elsewhere:

a.      On or about July 8, 2010, LEVIN submitted the first payment request relating to the 5 May Project seeking payment of $724,115.86.

b.      On or about July 16, 2010, SUTCIVNI approved the request causing COW to issue a payment of $724,115.86 to Five May Street Apartments on or about July 30, 2010.

c.      On or about August 2, 2010, LEVIN endorsed the COW check and deposited it or caused it to be deposited into the Five May Street Apartments account at Southbridge Savings Bank.

d.      On or about July 27, 2010, SUTCIVNI created a claim to DHCD seeking payment to COW for $184,115.86 in NSP funds disbursed for the 5 May Project.

e.      On or about July 27, 2010, SUTCIVNI created a claim to HUD seeking payment to COW for $200,000 in NSP funds disbursed for the 5 May Project.

f.      On or about July 28, 2010, SUTCIVNI created a claim to DHCD seeking payment to COW for $340,000 in NSP funds disbursed for the 5 May Project.

g.      On or about September 9, 2010, LEVIN submitted the second payment request relating to the 5 May Project seeking payment of $431,163.

h.      On or about September 15, 2010, SUTCIVNI approved the request causing COW to issue a payment of $431,163 to Five May Street Apartments on or about September 24, 2010.

i.      On or about September 27, 2010, LEVIN deposited or caused to be deposited the COW check into the Five May Street Apartments account at Middlesex Savings Bank.

j.      On or about January 12, 2011, SUTCIVNI created a claim to DHCD seeking payment to COW for $937,583, of which $366,163 in NSP funds had been disbursed for the 5 May Project.

k.      On or about November 18, 2010, LEVIN submitted the third payment request relating to the 5 May Project seeking payment of $250,000.

l.      On or about November 9, 2010, SUTCIVNI approved the request causing COW to issue a payment of $250,000 to Five May Street Apartments on or about November 23, 2010.

m.      On or about November 24, 2010, LEVIN deposited or caused to be deposited the COW check into the Five May Street Apartments account at Middlesex Savings Bank.

n.      On or about January 12, 2011, SUTCIVNI created a claim to DHCD seeking payment to COW for $937,583, of which $250,000 in NSP funds had been disbursed for the 5 May Project.

o.      On or about December 2, 2010, LEVIN submitted the fourth payment request relating to the 5 May Project seeking payment of $250,000.

p.      On or about December 6, 2010, SUTCIVNI approved the request causing COW to issue a payment of $250,000 to Five May Street Apartments on or about December 17, 2010.

q.      On or about December 20, 2010, LEVIN deposited or caused to be deposited the COW check into the Five May Street Apartments account at Middlesex Savings Bank.

r.      On or about January 12, 2011, SUTCIVNI created a claim to DHCD seeking payment to COW for $937,583, of which $215,000 in NSP funds had been disbursed for the 5 May Project.

s.      On or about March 15, 2011, LEVIN submitted the fifth payment request relating to the 5 May Project seeking payment of $200,658.

t.      On or about March 15, 2011, SUTCIVNI approved the request causing COW to issue a payment of $200,658 to Five May Street Apartments on or about April 1, 2011.

u.  On or about April 6, 2011, LEVIN endorsed the COW check and deposited it or caused it to be deposited into the Five May Street Apartments account at Middlesex Savings Bank.

v.  On or about June 1, 2011, SUTCIVNI created a claim to DHCD seeking payment to COW for $200,658 in NSP funds disbursed for the 5 May Project.

w.  On or about July 26, 2011, LEVIN submitted the sixth payment request relating to the 5 May Project seeking payment of $284,063.

x.  On or about August 2, 2011, COW issued a payment of $284,063 to Five May Street Apartments.

y.  On or about August 3, 2011, LEVIN deposited or caused to be deposited the COW check into the Five May Street Apartments account at Middlesex Savings Bank.

z.  On or about September 2, 2011, LEVIN submitted the seventh payment request relating to the 5 May Project seeking payment of $225,050.

aa.  On or about September 2, 2011, SUTCIVNI approved the request causing COW to issue a payment of $225,050 to Five May Street Apartments on or about September 16, 2011.

bb.  On or about September 21, 2011, LEVIN deposited or caused to be deposited the COW check into the Five May Street Apartments account at Middlesex Savings Bank.

**COUNT ONE:**        **(18 U.S.C. § 1349 - Conspiracy to Commit Wire Fraud)**

The Grand Jury further charges:

100.    Paragraphs 1 through 99 are re-alleged and incorporated by reference as though fully set forth herein.

101.    Beginning in or about July 2010 and continuing through in or about September 2011, at Worcester, in the District of Massachusetts, and elsewhere, the defendants herein:

> **1.       JAMES E. LEVIN, and**
> **2.       JACKLYN SUTCIVNI,**

together with others known and unknown to the Grand Jury, conspired to devise a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money from the HUD NSP, HOME and Lead Abatement Programs, and for the purpose of executing such scheme and artifice to defraud, to transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds in violation of 18 U.S.C. § 1343.

All in violation of Title 18, United States Code, Section 1349.

**COUNT TWO:**     **(18 U.S.C. § 1343 -- Wire Fraud)**

The Grand Jury further charges:

102.     Paragraphs 1-17, 18(a)-(d), 21, 28-63, 65-73, 99(z) through 99(bb) are re-alleged and incorporated by reference as though fully set forth herein.

103.     On or about September 21, 2011, at Worcester, in the District of Massachusetts, and elsewhere, defendants herein:

> **1.   JAMES E. LEVIN, and**
> **2.   JACKLYN SUTCIVNI,**

having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice and attempting to do so, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit, LEVIN deposited and caused to be deposited check number 659211, drawn on the BOA Account, in the amount of $225,050.00, into the Five May Street Apartments account at Middlesex Savings Bank, which resulted in an interstate transmission of said funds.

All in violation of Title 18, United States Code, Section 1343.

**COUNT THREE:     (18 U.S.C. § 286 – Conspiracy to Defraud the United States)**

The Grand Jury further charges:

104.    Paragraphs 1 through 99 are re-alleged and incorporated by reference as though fully set forth herein.

105.    Beginning in or about July 2010 and continuing through in or about September 2011, at Worcester, in the District of Massachusetts, and elsewhere, defendants herein:

> 1.   **JAMES E. LEVIN, and**
> 2.   **JACKLYN SUTCIVNI,**

and others known and unknown to the Grand Jury, knowingly and willfully conspired to defraud the United States Department of Housing and Urban Development by obtaining and aiding to obtain the payment and allowance of false, fictitious and fraudulent claims by obtaining HUD NSP, HOME and Lead Abatement Funds for the 5 May Project through the submission and approval of false and fraudulent payment requests.

All in violation of Title 18, United States Code, Section 286.

26

**COUNT FOUR:**     **(18 U.S.C. § 287 – False, Fictitious or Fraudulent Claims; 18 U.S.C. § 2 – Aiding and Abetting)**

The Grand Jury further charges:

106.     Paragraphs 1-18, 21, 28-44, 61-62, 65-71, and 99(z) through 99(aa) are re-alleged and incorporated by reference as though fully set forth herein.

107.     Beginning on or about September 2, 2011 and continuing through at least on or about September 21, 2011, at Worcester, in the District of Massachusetts, and elsewhere, defendants herein:

### 1.  JAMES E. LEVIN, and
### 2.  JACKLYN SUTCIVNI,

defendants herein, made and presented to employees of COW claims upon and against the United States Department of Housing and Urban Development for HOME Investment Partnerships Program funds, knowing that those claims were false, fictitious and fraudulent, in that the work for which the funds had been authorized was not done.

All in violation of Title 18, United States Code, Sections 287 and 2.

**FORFEITURE ALLEGATION - (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))**

The Grand Jury further alleges that:

108.    Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 1343 and 1349, set forth in Counts One and Two of this Indictment,

> 1.    **JAMES E. LEVIN; and**
> 2.    **JACKLYN SUTCIVNI,**

defendants herein, shall forfeit to the United States, jointly and severally, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, that constitutes, or is derived from, proceeds traceable to the commission of such offenses. The property to be forfeited includes, but is not limited to, the following:

At least $2,365,050.00, to be entered in the form of a forfeiture money judgment.

109.    If any of the property described in Paragraph 108, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the Court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of all other property of the defendants up to the value of the property described in Paragraph 108 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

**A TRUE BILL**

FOREPERSON OF THE GRAND JURY

Michelle L. Dineen Jerrett
ASSISTANT U.S. ATTORNEY

DISTRICT OF MASSACHUSETTS; August 24, 2016.

Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK   3:58 P.

29