UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 4:16-cr-40031-TSH-1 |
| JAMES E. LEVIN | |

## MEMORANDUM IN AID OF SENTENCING

Defendant James Levin ("Levin"), by and through undersigned counsel, submits this memorandum in conjunction with his sentencing scheduled for March 30, 2021. The parties jointly recommend, as set forth in greater detail herein, a sentence of a term thirty-seven (37) months' imprisonment,[1] followed by three (3) years of supervised release, is "sufficient, but not greater than necessary" to achieve the purposes of the Sentencing Reform Act. The parties further request that a forfeiture money judgment be entered at the time of sentencing, but that a hearing be held a short time thereafter to determine the sum certain of said money judgment as well as the amount of restitution.

### PROCEDURAL HISTORY

On August 24, 2016, Levin was charged in an indictment with one (1) count of conspiracy to commit wire fraud, in violation of 18 USC § 1349, one (1) count of substantive wire fraud in

---

[1] Levin has had a life-long struggle with alcoholism and is sincere in his desire to undertake programmatic rehabilitation while serving the carceral portion of his sentence. He therefore respectfully requests the Court make a judicial recommendation for placement in the Bureau of Prison's ("BOP") 500-hour Residential Drug Abuse Program ("RDAP"). Levin also requests that the Court make a judicial recommendation he serve his sentence at either FPC Lewisburg or FPC McKean (both in Pennsylvania), listed in order of preference, but that BOP make its ultimate classification determination, regardless of its relative distance from his home, that will maximally increase his placement into RDAP in light of bed space availability.

1

violation of 18 USC § 1343, one (1) count of conspiracy to defraud the United States, in violation of 18 USC § 287, and one (1) of false, fictitious or fraudulent claims in violation of 18 USC § 287. *See* ECF#4. The indictment also contains a criminal forfeiture allegation. *Id.* The allegations stem from misrepresentations Levin made in connection with the, *inter alia*, the drawing-down and use of public funding which had been set aside and disbursed for purposes of the development a distressed property located at 5 May Street in Worcester, MA with the aim of providing thirteen (13) units of affordable housing. Levin plead guilty to all four (4) counts of the indictment on September 28, 2020, *see* ECF#211, pursuant to a plea agreement. *See* ECF#210. Although the plea agreement envisioned a dispute by the parties in terms of both the calculation of Levin's advisory guidelines sentencing range as well as the sentence to be imposed, the parties have since engaged in lengthy and careful negotiations. The parties have since agreed to jointly recommend that a sentence of thirty-seven (37) months' imprisonment followed by thirty-six (36) months' supervised release is appropriate under the circumstances.[2]

## ARGUMENT

**I.        Applicable Law**

Under *United States v. Booker*, 543 U.S. 220, 259 (2005), the sentencing guidelines are no longer mandatory.  The Sentencing Reform Act requires the Court to consider guidelines ranges, *see* 18 USC § 3553(a)(4), but permits it to tailor the sentence in light of other statutory concerns. These concerns include reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public, and effectively

---

[2] Although the parties will likewise request the Court to enter a money judgment, the parties remain in dispute as to the amount of the money judgment as well as the restitution. Accordingly, the parties will ask at sentencing for a further hearing to be scheduled shortly thereafter to address these issues fully.

providing the defendant with needed educational or vocational training and medical care.  18 USC § 3553(a).  Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.  *Id.*[3]

The sentencing court must compute the guidelines, which are the "starting point and the initial benchmark," but which may not be presumed reasonable.  *Gall v. United States*, 552 U.S. 38, 49-51 (2007).  Then, the court considers the parties' arguments, after which it makes an "individualized assessment based on the facts presented," considering all of the factors under 18 USC § 3553(a).  *Id*.  Ultimately, the sentencing judge must select a sentence within the statutory range that is "sufficient, but not greater than necessary" to satisfy the varied purposes of punishment identified by Congress.  18 USC § 3553(a); *see also* 18 USC § 3553(a)(1)-(2).

The First Circuit has summarized the central principles of the post-*Booker* and -*Gall* sentencing procedure described above:

> This sequencing necessitates a case-by-case approach, the hallmark of which is flexibility.  In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them.  Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale.  Rather, the court "should consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

---

[3] Under *Booker,* this Court may consider certain factors that are rejected or ignored by the guidelines.  Sentencing courts previously were forbidden from considering, *inter alia*, a defendant's history and characteristics to the extent that they involved his mental and emotional condition, USSG § 5H1.3; her education and vocational skills, *id.* at § 5H1.2; drug or alcohol dependence, *id.* at § 5H1.2; socioeconomic status, *id.* at § 5H1.10; or lack of guidance as a youth, *id.* at § 5H1.12.  These factors can now support a sentence outside the guidelines.

*United States v. Martin,* 520 F.3d 87, 91 (1st Cir. 2008) (quoting *Gall*, 552 U.S. at 52).

## II.     Advisory Guideline Calculations

The parties and U.S. Probation agree with respect to the numerical calculation of Levin's advisory guidelines sentencing range. All counts of the indictment "are grouped for guideline calculation purposes because the offense level is determined largely on the basis of the total amount of harm or loss" as defined under USSG § 3D1.2(d). Presentence Report ("PSR") ¶105. Each count of conviction is governed by USSG § 2B1.1; because Levin was convicted of violating a statute, *see* 18 USC § 1343, that carries a maximum penalty of twenty (20) years' imprisonment, a Base Offense Level ("BOL") of seven (7) applies. USSG § 2B1.1(a)(1); PSR ¶106. The parties agree that because the loss exceeds $1.5 million but is less than $3.5 million, sixteen (16) levels are to be added. USSG § 2B1.1(b)(1)(H); PSR ¶107. The parties likewise agree that because the offense involved sophisticated means in its commission, two (2) levels are to be added. USSG § 2B1.1(b)(10)(C); PSR ¶108. Levin has clearly demonstrated acceptance of responsibility for the offense and timely notified the government of his intention to plead guilty; a 3-level decrease pursuant to USSG § 3E1.1(a), (b) therefore applies. PSR ¶¶114, 115. Levin's Total Offense Level ("TOL") is therefore 22 and his criminal history score is zero (with a corresponding Criminal History Category I) which results in a guidelines sentencing range ("GSR") of 41-51 months' imprisonment. PSR ¶¶116, 153. The parties not only agree with U.S. Probation's numerical calculation of Levin's TOL and resultant GSR, but they also agree that a sentence of thirty-seven (37) months' imprisonment followed by thirty-six (36) months' supervised release is appropriate under the circumstances.

## III.    The Requested Sentence Is Sufficient, But Not Greater Than Necessary, To Comply With The Statutory Purposes Set Forth In Under the Sentencing Reform Act.

After determining the guideline range, this Court must consider whether the statutory factors warrant an ultimate sentence above or below the guideline range. *United States v. Jiménez-Beltre,* 440 F.3d 514, 518-19 (1st Cir. 2006). The Supreme Court has emphasized that section 3553(a) is "more than a laundry list of discrete sentencing factors; rather, it is a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Rodríguez*, 527 F.3d 221, 228 (1st Cir. 2008), citing *Kimbrough v. U.S.,* 552 U.S. 85, 101 (2007). That tenet – the "parsimony principle" – instructs "district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.*, quoting 18 USC § 3553(a).

### A. Levin's Personal History and Characteristics

Levin, sixty-two (62) years old, appears before this Court to be sentenced for crimes he committed nearly a decade ago. By tracing the arc of his life to that point and following its course to the present, as is described more fully below, the reasonableness of the parties' joint recommendation of thirty-seven (37) months incarceration becomes manifest.

Levin's upbringing was hardly ideal. As a child, he underwent multiple surgeries to address congenital abdominal tumors that required long-term administration of opiates to manage severe post-operative pain—an almost ominous foreshadowing of the substance abuse struggles he would face throughout his life. He was raised alongside two (2) brothers and a sister in a home that became increasingly fractured in his adolescence. His father, Melvin, who at the time was an associate professor at a local university, left home when Levin was approximately twelve (12) years old. This placed the lion's share of parental responsibilities on his mother who proved ill-suited to bear them.

Levin reports that his mother lived and worked four (4) days a week in Concord, New Hampshire during which time Levin assumed the role of surrogate father to his younger brother,

Tom.[4] Although she was working, her spending habits prioritized trivialities (Levin recalls the unexpected purchase one day of a ping-pong table) over necessities. As a consequence, Levin and his siblings often went hungry; to remedy this, Levin reports he began taking on odd jobs when he was thirteen (13) (mostly yard work, snow clearing, and similar kinds of manual labor around the neighborhood) so that he and his siblings could afford to buy (themselves) food. When his mother would return home for the weekend, he reports she would often make large meals and the family would then gather. However, her presence tended toward the destructive as Levin recalls she furnished her children—some of whom were not yet old enough even to get their driver's license—with liquor and marijuana. It was approximately around this time Levin and his brother discovered they had inherited her predisposition to alcoholism (indeed, as reflected in the PSR, Levin and his brother would often sneak out and try to find alcohol, oftentimes taking it from their neighbor's homes). When his mother drank, she became violent which she directed exclusively at Levin, but only seemingly because he interceded whenever it appeared one of his siblings might become her next target. He recalls frequent trips to the emergency room for a smattering of broken bones and at least one head injury. Tom describes his own experience of the time, their relationship with/behavior of their mother, the relationship he had and continues to have with Levin as follows:

> Growing up, our homelife was difficult and quite dysfunctional. After our parents split when I was 4, my father was absent through much of my childhood. Our mother did what she could but her drinking and the string of questionable baby sitters she enlisted in exchange for room and board helped created a chaotic and generally unsafe atmosphere for a child...
>
> Through it all, Jim was a constant source of stability, mentorship, and refuge to me. Many people comment on how our speech and mannerisms are very similar. That is because in the absence of a present father figure, I modelled myself on Jim. When

---

[4] According to Tom, "I owe so much to him including life skills that others might learn from their parents: From childhood skills like how to tie my shoes and ride a bike, to adult skills like how to negotiate a car loan, how to conduct myself in the workplace, how to buy a house and so many others." See Letter of Support by Tom Levin, filed herewith.

> he got married, Jim and his wife took an apartment within walking distance. This allowed me to stop by after school, for meals, and on weekends. Whenever I was in trouble, Jim was my first call. There are numerous stories I could tell about Jim and what he has meant to me, but I'll relate just one here.
>
> When I was 16, my mother and stepfather got into a particularly bad argument. My mother was drunk and had been deep frying shrimp. She managed to set the range hood on fire. This led to my stepfather screaming at her. She began to throw plates at him. We had a huge collection of mismatched plates, so she had a lot of ammunition. I called Jim immediately. He showed up within minutes and I sat in his car with his wife Jan. We made awkward small talk while Jim tried to physically intervene. My stepfather, a very strong warehouse worker, grabbed Jim by the stomach and jerked him out of the way. Later, Jim developed a hand-shaped bruise on his stomach. Nonetheless, he managed to defuse the situation and keep it from spiraling farther out of control. When I finally went back in, I saw Jim calmly sweeping up the plate shards.

*See* Letter of Support by Tom Levin, filed herewith.

The family home attained a measure of stability towards the end of high school when Levin's would-be step-father (who Levin's brother reports often struggled with managing his anger) moved in with his mother. His step-father's profession—construction—piqued Levin's interest; he would often ask his step-father to show him how to fix things around the home. At the same time, Levin's relationship with his biological father improved greatly as the two began to see one another regularly, bonding over shared interests in billiards and chess. Levin reports he looked up to his father, who was fluent in nine (9) languages, due to his reputation in the community as a staggering intellect and was so influenced by his father during that time that Levin indicates he hears his father's voice in his mind when deep in thought. They became so close that when Levin graduated from high school (which he was managed to complete in three (3) years) he chose to attend Rutgers University where his father had also accepted a professorship. Although Levin lived off-campus with his father where their relationship further blossomed, he reports it was then that his struggle with alcohol abuse began in earnest: while his college classmates were drinking beer, Levin recalls, he chose scotch.

After Levin graduated from college in the Spring of 1980, he moved back home, married his high school sweetheart, Jan, that summer, and entered Suffolk Law School in the Fall. Jan insisted Levin reduce his drinking to acceptable limits which he was able to successfully maintain through law school and following the birth of his only son in 1986. Levin's resolve began to weaken, however, with increasing anxiety associated with the responsibility of having to provide for his family financially.

Although Levin and his father, who accepted a tenured position at the University of Maryland, had become physically distanced, they remained as close as ever and spoke to one another by phone four (4) to five (5) times per week. During one such call in January, 1999, Levin's father reported he had been diagnosed with a form of bladder cancer. He further advised that it was curable but that he had made up his mind to decline treatment because the surgical intervention it required would have permanently diminished his quality of life. For the next eleven (11) months, Levin did all he could to both maximize what time he had left with his father as well as to ensure his father was cared for. He flew back and forth from Massachusetts and Maryland, sometimes with his wife and teenage son and other times with his younger brother. He convinced his mother (whose second husband had passed away the year before) to move down to Maryland so she could care for Melvin for while he was away. He even arranged for their remarriage. As Melvin's health diminished precipitously, Levin did for his father what his father undoubtedly did for him as a baby. A few weeks before Melvin died at the end of December, Levin made sure his older brother, who had become estranged from the family and had not spoken to Melvin after he was diagnosed, returned to Maryland.

Whatever resolve remained of Levin to resist the urge to drink to excess was, by that point, altogether shattered. In the summer of 1999, before his father passed, Levin became aware that his

mental health had likewise begun to deteriorate sharply and began seeing a therapist. He was diagnosed with depression and prescribed an SSRI. His therapist advised him to stop drinking; Levin did not heed their advice and instead can recall saying to himself it was the alcohol, not the medication, that was making him "level." From then on through the present, Levin has waged what has become a two (2) decades long war with alcoholism.

While Levin's offense conduct is no doubt serious and deserving of the stern condemnation he is prepared to accept, the outpouring of support in the form of the many letters filed with this memorandum is truly remarkable. In undersigned counsel's over thirty (30) years of legal practice, this is a first in terms of the extent of such outpouring from friends, family and the community. The following are but a handful of examples which can be found in these letters:

- We were married only three years when my mom became sick. Jim was busy with Suffolk Law School, but he found the time to study and help me care for my mom until the day she died... he dropped everything to care for my mom and then take his exams. Jim would sit with her for hours and talk. He would carry her into the house, make her feel she was the most important person in the world, and focus solely on her. *See* Letter of Support by Jan Gardner (wife), filed herewith.

- In 2010, my dad was diagnosed with terminal cancer. I was 18 at the time and just getting ready to leave for college. I was nervous to leave home when my dad needed me most, but Jimmy made it clear he would step in to support when I could not. During his six-year battle, Jimmy was constantly there supporting him and the family with whatever they needed. He would frequently drop everything he was doing to fly across the country to spend time with my dad. He would stay up late into the night talking on the phone when my Dad could not sleep due to the pain. He arranged a sailing trip for my dad, knowing sailing was one of his favorite pastimes. He was my dad's, and my, shoulder to cry on. *See* Letter of Support by Cole Levin (nephew), filed herewith.

- Shortly after we moved in, Jim and Jan rang the doorbell with baked goods in hand and sat with us in our not-fully-unpacked kitchen and made the effort to get to know us. Later that first year, I mentioned to Jim that I wanted to find a fence company to fence in our backyard, and he suggested that I could do it myself, not knowing how profoundly unhandy I am. After I set him straight, he declared that he would do it with me, and we'd be able to manage. Jim ended up spending two full weekends with me digging holes, setting (and resetting) posts, and securing wire mesh out of the generosity of his person. That fence still stands 15 years later. This is the Jim Levin I know. *See* Letter of Support by Ashley Shih (former neighbor), filed herewith

- Over 10 years ago, this relationship turned from friendly to formal when I ask Jim to help me build a new business, 1D8 Mobile... For me, it turned out to be the hardest personal and professional challenge of my life. Me and my family personally financed the company and at several times, it was very close to failure in the 2008-2009 recession. This caused us severe economic and personal struggles that led me into severe depression with frequent suicidal thoughts... When I thought nobody else could be there to help me, Jim was there. Jim has a brilliant ability to help me see the basics of the business, the clear way to the light and the step by step hard work to slowly move forward and build the business. Jim listened, he shared and then helped me first out of my foggy depression and then into a slow growth plan for the business when I thought there was no way out. Within a year, we had turned the business around to become one of Apple's top suppliers for the 2009 Christmas season and eventually we were able to sell the business for the benefit of the employees and stakeholders. *See* Letter of Support by Stuart Nixdorff (friend of 17 years), filed herewith.

- Counting on the Levin's friendship and care became necessary as my husband became sick in 2002. For three years he battled cancer, and my family, with the help of Jim and Jan, navigated the difficult years with laughter and love... Jim is one of those positive influences. As Mike became weaker, he would sit in the yard and Jim would be at his command, pulling weeds, moving plants, anything that Mike wanted. When Mike's prognosis was poor, we brought him home to hospice care so he could spend his final days surrounded by friends and family. A call from me at the hospital was all it took for Jim and some of my other friends to retrofit the dining room to a bedroom for Mike before we got home, no questions asked. Jim would hold Mike's hand, rub his feet and comfort him. *See* Letter of Support by Carole Bernstein (friend of over 20 years), filed herewith.

- When my youngest daughter, Marlena, was about twelve years old she contracted one of the worst cases of lime disease recorded in the United States. She went from a perfectly healthy young lady to a wheelchair ridden girl and got so weak she couldn't even lift a fork to her mouth to eat, literally overnight. She spent five years in that wheelchair-and recovered eventually but it was a long and extremely difficult time in our lives. At times like that you find out who your friends are. Many people that we thought were our friends slowly disappeared from the scene. Jim was one of the few that made an extra effort to visit Marlena and make her smile. On one occasion he invited her to a Red Sox game. Needless to say, trying to maneuver a young girl in a wheelchair around Fenway Park is not an easy task. Jim thought nothing of it and showed my daughter the time of her young adult life. I will never forget the smiles and laughter Jim brought to my daughter and my wife and I when we really needed it. This is the man I have come to know over past several years. *See* Letter of Support by Daniel Connors (friend of over 30 years), filed herewith.

- My personal experience with Jim is that he is kind, respectful, and always treated me and my family well. My mother had major surgery this year and he takes the time to check in with her to see how she is doing despite his current situation. At any time, day, or night, if l needed advice or help on any subject matter, he would always listen and help. Those types of friendships are hard to come by. *See* Letter of Support by Vanessa Levin (sister-in-law), filed herewith.

These letters, which span over sixty-two (62) pages, uniformly describe a loving, devoted, selfless man who has spent much of his life tirelessly doing for others what he can to support them in their time of need. He is seen as a mentor and confidante, a philanthrope, and dependable. And this vision of Levin which emerges from these letters is not premised on some general sense of the man but are grounded in real-life memories that have stuck with those who have taken the time to share them.

### B. Nature of the Offense Conduct

Levin for the most part does not dispute the PSR's Statement of Offense and does not intend to retread the detailed recitation of facts it contains except as is necessary to provide additional context. Prior to 2010, when Levin purchased 5 May Street and entered into loan agreements with the City of Worcester "COW," he was involved in the development and subsequent sale of four (4) properties; each were commercial, privately sold, and developed without the use of public funding, and were purchased/developed at various intervals between 1993 through 2007. Aside from these real-estate transactions, Levin had been working as a general practitioner for Laird Pendleton, mostly in the context of contract or similar kinds of negotiations.

5 May Street was a property that was effectively a blight on the area. The property was occupied exclusively by squatters notwithstanding that it was entirely unfit for habitation. Law enforcement and the fire department were frequently called to respond to the location. It also required both asbestos and lead abatement. In short, the building was a standing public safety risk. Levin contractually bound himself to purchase this property (with, as noted above, not a shred of experience dealing with such a project) in November, 2009—before COW had even granted him of a conditional commitment of public funding. Indeed, nearly eight (8) months elapsed between the time Levin contractually obligated himself to purchase this safety hazard and when he actually

knew (not conditionally) he would receive the funding necessary to change the property.

Moreover, as noted in the PSR, the loan agreement between Levin and COW limited his ability to drawdown funds spent on "Eligible Project Costs" which do not appear to include various soft costs incurred to maintain the premises (such as those Levin submitted in connection with the first AIA form he submitted, *see* PSR ¶48). Further, the loan agreement required Levin to "[p]rovide rental unit(s) at the Property at the rental prices set forth in Exhibit E and in accordance with the Affordable Housing Restriction attached hereto in Exhibit F" for fifteen (15) years or the entire loan amount would be due. In other words, the ability of any developer in Levin's position to recapture either soft costs not covered by the loan agreement would be directly tied to the profitability of the property post-completion, and then only over an extended period of time.

Levin hired an architect, Steven Petitpas, as well as a consultant, Andrew Howarth, of Worcester Community Housing Resources, Inc. both of whom helped him to determine how best to structure the units to maximize long-term profit. As of March 2010, both Petitpas and Howarth had exchanged emails with each other and Levin in which they were still discussing the number of units and bedrooms the building should have, whether dishwashers would be installed or if any of the units should be configured to permit installation of stacking laundry machines. Similarly, Petitpas issued a number of changes to the architectural drawings prior to the signing of the first loan agreement in July, 2010 and more than two dozen times after construction began later that year in October. Moreover, the project faced various unexpected setbacks that further drove up construction costs. For example, asbestos was found on-site and at one point the basement which required environmental assessment and remediation. In short, that the estimated construction costs changed over time is unsurprising.

The foregoing, however, is offered only to provide context to information contained in the statement of offense conduct without which there is a suggestion that Levin steadily drove up his construction costs as a way to bilk COW of more and more money. This suggestion, if taken as true, would be a misconstruction of the underlying fraud. In addition to acquisition costs, Levin incurred various soft costs at the outset, well before the loan agreement had been finalized, let alone signed by COW. The revolving line of credit offered by MHIC came with strings, including an interest rate, and, like the limitations on eligible costs in the loan agreement with COW, would not have fully covered what he expended early on these soft costs. Once COW signed the loan agreement, Levin had a temporary solution; he would simply draw down—in his very first AIA requisition—approximately $250,000 in ineligible soft costs, as opposed to attempting to hide them as eligible costs. However, as problems with asbestos and flooding emerged, and as he diverted some 5 May funding to pay subcontractors who were working at other projects, the gap in funding widened to the point that it was unable to sustain costs associated with major revisions to the floor plans to make them DHCD compliant the spring of 2011.

Notwithstanding the failure of the project, it is respectfully submitted that Levin did, indeed, intend to finish developing the property. The reality, though, was that Levin should never have permitted himself to take on the project. He lacked the regulatory know-how, he was entirely without the organizational wherewithal to maintain accurate bookkeeping, and he simply did not have the kind of monetary backing to float the kinds of costs that likely constituted the bulk of his life savings at the time. In short, he was in "over his head". And he knew it. Most importantly, Levin was fully aware his alcohol dependence made him prone to poor decision making. This is the context within which Levin perpetrated the fraud he has plead guilty to. After all the money had run out and a request for more funding was denied, Andy Nelson of DHCD issued a

memorandum in July, 2011—based on an on-site inspection he had conducted as well as a review of Levin's most recent One Stop funding request—that concluded with suggestions to improve the project which he prefaced with: "The 5 May Street One-Stop has made significant progress since the previous application, and the project has merit in a number of categories." Though this illustrates that sincere efforts were made to bring the project to completion,[5] it was simply unable to recover from the gap in funding created by Levin's fraud at the outset of the project.

C. Post-Offense Conduct Circumstances

Although Levin has served no time in custody beyond the brief period he was held on the day of his arrest, Levin's world began to close in around him almost a decade ago. In 2012, he began to experience symptoms of high blood pressure, vision impairment, confusion and agitation, following a surgery to repair two herniated disk in his back. He was subsequently diagnosed with pernicious anemia, typically caused by stress, which is treated by weekly vitamin B12 injection. A year later, his 80 years-old mother, who was entirely self-sufficient and surprisingly savvy with new technology, suffered a significant cognitive fall as she descended into dementia. Her body declined rapidly thereafter due to cancer; she died in 2015. Levin's drinking then ramped up while his forty-one (41) year old marriage has reached an apparent breaking-point; although his wife continues to support him, she has begun the process of separation and their future entirely uncertain.

One bright spot has remained which he reports helped to attain a period of sobriety and influenced his decision to take responsibility for his offense conduct. His only son had become a

---

[5] Petitpas drafted a letter to Levin in which he opined that approximately $300,000 in funding was necessary to complete the project.

14

father to a baby girl. Levin's wife, Jan, describes his relationship with both his son and newborn as follows:

> Jim's love for our son is palpable. His devotion to Denys was unmatched, until now. Denys has a beautiful 15-month year old daughter, Georgina (Georgie), who makes Jim light up like he used to be. I am saddened that Jim will be in prison for the birth of our second granddaughter in September. But I know once he is released, he will love and care for her, and she will understand the greatest love of a grandparent.

*See* Letter of Support by Jan Gardner, filed herewith. Similarly, Levin's son advises he "see[s] a man who has already grown into one of my daughter's favorite people -- now the consummate grandfather." *See* Letter of Support by Denys Levin, filed herewith.

It has become Levin's primary aim to put this dark chapter of his life behind him. Although he has voluntarily commenced with seeing a counselor who specializes in substance abuse treatment, Levin had been unable to master his alcoholism and has chosen to view his future incarceration as an opportunity due to the rehabilitative programs available. Jan has offered the following both in terms of the remorse Levin has felt about his offense conduct, the psychological toll coming to terms with it has taken on him, as well as his struggles with alcohol in the intervening time as follows:

> Although Jim continues to help people as he has always done, the toll of the past eight years, and specifically the last four, has dimmed his inner light and has made our marriage situation almost untenable. After the initial news story was published, Jim found it difficult to find work. Always the provider, he suddenly became the pariah. We had to move to a smaller home, and he spent years trying to get back on his feet...
>
> Since then, Jim's drinking has increased. While always a social drinker who sometimes drank too much, I see him now as the alcoholic he is. And while I don't drink, I hope for the day that Jim doesn't need alcohol to calm him, help him sleep, or help him find the laughter in life. And although he has tried to smile, this process has hardened him. Jim is unable to sleep most nights and after pre-trial probation for 4 ½ years, we are both exhausted and depleted. I've gone from fear that Jim would commit suicide to anger that he exposed his family to his aberrant activity. I know my husband has done all he could. I understand he has suffered as well. I see

> glimpses of "my" Jim when he holds Georgie, I see glimpses and have hope we will go back to our normal life. While I hope that and I plan to help Jim throughout his incarceration and after, I do not know if we can go back to our normal life. I just hope you see my words, the words of Jim's friends and loved ones, and understand he is a good man who made a poor error in judgment, and even though I have asked if others are to blame, Jim says, it ultimately was his responsibility. This is the Jim I know and the man who stands before you now.

*See* Letter of Support by Jan Gardner, filed herewith. He hopes to return as the man he once was so he can provide the kind of grandfatherly love and support never knew.

### D.  Overview of Section 3553(a) Considerations

A holistic consideration of the section 3553(a) factors amply support the jointly recommended sentence of 37 months imprisonment follows by 36 months of supervised release. At the heart of Levin's offense conduct is the misappropriation of public funds for much-needed low-income housing. He fully appreciates, notwithstanding undersigned counsel's attempted advocacy, that whatever his intent to complete the project may have been is completely beside the point. Three (3) years of incarceration represents a substantial sentence for any first-time offender, particularly when viewed against the backdrop of the last eight (8) years during which time the effects of being actively investigated and subsequently indicted could be felt in every facet of his life—from his marriage, to the realization of what he will miss of his granddaughter's development, to the suspension of his license to practice as a lawyer and certain disbarment, his reputation in the Legal,[6] Business, and Local community as well as his substantially reduced finances/earning capacity as he approaches the age of retirement. Moreover, an appropriate measure of leniency ought to be considered against any urge to sentence Levin over-and-above the

---

[6] Levin has been advised that bar counsel intends to request a temporary suspension, rather than permanent disbarment, in connection with his license to practice law in the Commonwealth.

sentence jointly recommended by the parties in light of the life, as more fully described the in the letters of support attached hereto, he has otherwise well and commendably lived.

Levin acknowledges his need for rehabilitation and the 37 months sentence recommended herein makes manifest the mandate it be "no greater than necessary." The sentence if imposed will help ensure his placement into RDAP and (because the full amount of completion credits are only available to sentence of 37 months or more) will provide him a powerful incentive to complete it. As a result, the kind of sentence of available which has been requested—one which aims to ensure Levin's placement in RDAP—will most effectively serves the twin aims of sentencing, namely rehabilitation and deterrence.

## CONCLUSION

Based on the foregoing, Levin respectfully requests a sentence of a term thirty-seven (37) months' imprisonment,[7] followed by three (3) years of supervised release be imposed. Levin further requests, given his strict adherence to all current conditions of release as well as health concerns associated with the COVID-19 pandemic for persons of Levin's advanced age that he be permitted to self-report to the facility designated by the Bureau of Prisons.[8]

Dated: March 26, 2021

Respectfully submitted,
JAMES LEVIN
By and through his attorney,

/s/ R. Bradford Bailey
R. Bradford Bailey, BBO#549749

---

[7] Levin further requests this Court make judicial recommendations in keeping with those set forth in FN1, *supra*.

[8] Levin reports that he is scheduled to receive his first COVID-19 vaccination shortly and that a second vaccination will likely be scheduled sometime in May. He therefore respectfully requests that in addition to the standard 42 days in which he would ordinarily be eligible to self-report, he not be required to self-report to the designated facility until such time as he has received both vaccinations and enough time (approximately 2-3 weeks) elapse for it to fully immunize him from the virus.

Adamo L. Lanza, BBO#689190
Brad Bailey Law, P.C.
44 School Street, Suite 1000B
Boston, Massachusetts 02108
Tel.:   (857) 991-1945
Fax:   (857) 265-3184
brad@bradbaileylaw.com

**Certificate of Service**

I, R. Bradford Bailey, hereby certify that on this the 26th day of March 2021, I caused a true copy of the foregoing motion to be served upon all necessary parties to this matter by virtue of electronically filing the same via the CM/ECF system.

*/s/ R. Bradford Bailey*
R. Bradford Bailey